# In the United States Court of Federal Claims

Nos. 24-1879 & 24-1883
(Filed: March 28, 2025)
(Re-issued: April 11, 2025)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CENTERRA SECURITY SERVICES GMBH,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CONTINUITY GLOBAL SOLUTIONS, LLC,

*Plaintiff*,

v.

THE UNITED STATES

*Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Daniel J. Strouse*, Arlington, VA, for plaintiff, Centerra Security Services GmbH.

*Carla Joanne Weiss*, Washington, D.C., for plaintiff, Continuity

---

[1] This opinion was originally issued under seal to afford the parties an opportunity to propose redactions of protected information. The parties have conferred and reached an agreement on proposed redactions, which we have adopted. Redactions are indicated by the insertion of asterisks in place of original material.

Global Solutions, LLC.

*Robert Ralph Kiepura*, Trial Attorney, United States Department of Justice, Civil Division, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant. *Kevin P. Stiens*, of counsel.

## OPINION

BRUGGINK, *Senior Judge*.

In this post-award bid protest, Centerra Security Services GmbH ("Centerra") and Continuity Global Solutions, LLC ("CGS") allege that the U.S. Army improperly awarded a contract to Pond Security Services GmbH ("Pond"), the incumbent, to perform armed security services for Army installations in Germany. Plaintiffs seek a permanent injunction to enjoin performance under the awarded contract and direct the agency to reevaluate the offerors' proposals and make a new award decision. Plaintiffs have filed their respective motions for judgment on the administrative record, which have been consolidated. The government has cross-moved. Oral argument was held on March 18, 2025. Because the agency arbitrarily relied on unstated evaluation criteria under past performance in making its award decision to Pond, and in penalizing CGS's proposal, we grant CGS's motion for judgment on the administrative record. Because we have not found the agency made an otherwise erroneous evaluation, we deny Centerra's motion for judgment on the administrative record. Accordingly, we deny the government's cross-motion with respect to CGS and grant it with respect to Centerra.

## BACKGROUND

I.    The Solicitation and Evaluation Criteria

On September 26, 2023, the Army issued solicitation No. W564KV23R0050 to procure armed security services for U.S. Army installations in Germany. Administrative Record ("AR") 1114, 1197. The Army intended to award a single, firm-fixed-priced, Indefinite Delivery, Indefinite Quantity ("IDIQ") contract for a potential eight-year performance period. AR 2084, 2170. The performance period included a six-month phase-in/phase-out period, where the incoming contractor would "gradually assume the responsibilities of the incumbent contractor," a seven-year ordering period, and an optional six-month extension period. AR 2097. During the seven-year ordering period, the first three years would be on a firm-fixed-price basis, while the latter four years would allow for an economic price

adjustment. *Id.*

Armed security personnel under this contract would provide "installation access control, roving security patrols, explosive detection dog (EDD) teams, intrusion detection systems (IDS) monitoring, pass and badge control, static personal security, or any other security related function associated with the protection of U.S. Government installations, materials, property, and personnel." *Id.* The Performance Work Statement ("PWS") required the contractor to provide these services at various locations throughout Germany, required key personnel to be proficient in English, and required all personnel to be able to communicate in both English and German. AR 2099–100, 2103–04.

The PWS required the contractor to administer various levels of training and testing to its employees, including operations security ("OPSEC") training, iWatch Training, Information Assurance ("IA") Training, Physical Ability Testing, and Drug Abuse Testing. AR 2106–08, 2110. The contractor was also required to obtain various permits and licenses, including a § 34a GewO ("German Trade Code") permit—necessary for conducting commercial security services in Germany, a Good Conduct Certificate for Government Authorities, a clearance certificate from the business tax office, a clearance certificate from the social insurance agencies, proof of liability insurance, a Company Firearm License ("CFL"), a § 11 (1) 6 TierSchG ("Animal Protection Law") permit—necessary for training security dogs, and a § 7, 20 Sprengstoffgesetz ("Explosives Law") permit. AR 2109–10.

The solicitation included detailed proposal instructions, which called for offerors to organize their proposals in four volumes: (1) General Documents; (2) Technical Factor; (3) Past Performance Factor; and (4) Price. AR 2163. Under Volume I, General Documents, offerors were required to include the following documents: a completed Standard Form 1449,[2] an acknowledgment of all amendments to the solicitation, a list of persons authorized to conduct conversations or negotiations, and other representations and certifications. AR 2163–64.

Volume II, Technical Factor, was comprised of two Subfactors, Subfactor I, Phase-in Plan, and Subfactor 2, Management Plan. AR 2164–

---

[2] Under FAR 53.212, a Standard Form 1449, a Solicitation/Contract/Order for Commercial Products and Commercial Services, "is prescribed for use in solicitations and contracts for commercial products and commercial services." 48 C.F.R. § 53.212.

65. Under Subfactor 1, Phase-in Plan, an offeror was to propose detailed processes for assembling its workforce in accordance with the PWS, including recruitment and hiring, permits and licensing, drug abuse testing, medical screening, physical ability testing, background checks, language verification, obtaining Army installation access, and personnel training. *Id.* Under Subfactor 2, Management Plan, an offeror was to provide a plan for maintaining its workforce, establishing an organizational structure, and establishing a risk management process. AR 2165.

The Army applied the below adjectival ratings in evaluating each offeror under the Technical Factor, including both subfactors:

| Rating | Description |
| --- | --- |
| Outstanding | Proposal demonstrates an exceptional approach and understanding of the requirements and contains multiple strengths and/or at least one significant strength, and risk of unsuccessful performance is low. |
| Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength or significant strength, and risk of unsuccessful performance is low to moderate. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is unawardable, and/or risk of performance is unacceptably high. |

AR 2171–72.

Under Volume III, Past Performance Factor, offerors were required to provide up to seven recent and relevant past performance references. AR 2165, 2173. A reference was "recent" if the contract was performed within five years prior to the solicitation. AR 2173. The Army would evaluate the "relevancy" of each past performance reference "in terms of scope, magnitude and complexity." *Id.* A past contract was relevant in "scope" if it involved armed security guard services, relevant in "magnitude" if it had an estimated value of €10 million or greater, and relevant in "complexity" if it

4

involved 24/7 guarding services at multiple access locations. AR 2173–74. There was no geographic requirement with respect to where guard services had been performed, nor for which government agency those guard services had been performed.

The Army used the below relevancy ratings for each offeror's past performance contract:

| Rating | Definition |
|---|---|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

AR 2174.

After considering the recency and relevancy of all the offerors' past performance contracts, the Army used the below confidence ratings to rate each offeror's overall past performance:

| Rating | Description |
|---|---|
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available, or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |

| | |
|---|---|
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

*Id.*

Under the last Volume, Price, the solicitation informed offerors that the Army would evaluate each offeror's price proposal for "completeness, reasonableness, and balance." AR 2174–75. Although the Technical Factor was more important that the Past Performance Factor, Price was the single most important Factor in the agency's evaluation, as "[a]ll nonprice factors, when combined, are approximately equal in importance to price." AR 2170.

## II.  The Procurement Process

In accordance with FAR 15.306(c), after an evaluation of the initial proposals, the Army would only proceed to conduct discussions with offerors in the competitive range.[3] The Army conducted two rounds of discussions, allowing a total of three proposal revisions. Below is a timeline of the agency's procurement process:

| Event | Date |
|---|---|
| Initial Proposals Due | November 27, 2023 |
| Initial Evaluation/Competitive Range Determination | February 21, 2024 |
| Discussions Opened | March 7, 2024 |
| First Revised Proposals Due | March 25, 2024 |
| First Revised Proposals Evaluation | April 1, 2024 |
| Second Revised Proposals Due | April 3, 2024 |
| Discussions Closed | April 11, 2024 |
| Final Revised Proposals Due | April 15, 2024 |

---

[3] Under FAR 15.306(c), when an agency engages in discussions with offerors, it must establish a competitive range "[b]ased on the ratings of each proposal against all evaluation criteria," and the competitive range must be "comprised of all of the most highly rated proposals." 48 C.F.R. § 15.306(c)(1). Offerors excluded from the competitive range are "removed from consideration for award." *Id.*

| Award | August 29, 2024 |

AR 2024, 4048, 4055–59, 4086–90, 4124–27, 5000, 5917, 5928, 5939–40, 6705–13, 7596.

a. Initial Proposals and the Competitive Range Determination

In response to the solicitation, the Army received five initial proposals from Centerra, CGS, ESD Sicherheitsdienst GmbH ("ESD"), Pond, and Sanford Federal, Inc. ("Sanford"). AR 2176, 2362–63, 2606–07, 2866, 3151–52. The agency's Contract Specialist, Contracting Officer, and Source Selection Authority established a competitive range that excluded ESD and Sanford from consideration and opened discussions with Centerra, CGS, and Pond. AR 4048.

Under the Technical Factor, the Competitive Range Determination gave CGS five "Uncertainty" ratings, two "Weakness" ratings, one "Deficiency" rating, and two "Strength" ratings, combining for an overall technical rating of "Unacceptable." AR 4030. Centerra was given three "Uncertainty" ratings and four "Strength" ratings, combining for an overall technical rating of "Good." *Id.* Pond was given two "Uncertainty" ratings, one "Weakness" rating, four "Strength" ratings, and two "Significant Strength" ratings, also combining for an overall technical rating of "Good." *Id.*

Under the Past Performance Factor, the Competitive Range Determination found all of CGS's seven references "Recent" and "Relevant," resulting in an overall past performance rating of "Satisfactory Confidence." AR 4040–41. Though all seven of Centerra's references were deemed "Recent," only three references were deemed "Relevant," with one "Somewhat Relevant" and the remaining three "Not Relevant" for lack of scope and magnitude, resulting in an overall past performance rating of "Satisfactory Confidence." AR 4042–43. For Pond, all of its seven references were deemed "Recent," while two were deemed "Very Relevant," four "Relevant," and one "Not Relevant" for lack of magnitude, resulting in an overall past performance rating of "Substantial Confidence." AR 4043–44.

The agency's overall ratings for CGS's, Centerra's, and Pond's initial proposals are outlined in the below matrix:

| Offeror | Technical Rating | Past Performance Rating | Price |
|---------|------------------|-------------------------|-------|
| CGS | Unacceptable | Satisfactory Confidence | * * * * * * * * |
| Centerra | Good | Satisfactory Confidence | * * * * * * * * |

| Pond | Good | Substantial Confidence | * * * * * * * * * |
|------|------|------------------------|-------------------|

AR 4048.

Overall, the agency's initial evaluation found Centerra and Pond "clearly among the most highly rated proposals notwithstanding their higher price," determining that each "contains numerous strengths" and "has favorable past performance information." AR 4048. The agency also found that, although CGS received a Technical Factor rating of "Unacceptable," its one "Deficiency" rating "should be relatively easily resolvable during discussions," and that it "has a reasonable chance of being selected for award" due to its competitive past performance rating and comparatively low price. *Id.*

The Army notified CGS, Centerra, and Pond of its initial evaluation findings and allowed each offeror to submit proposal revisions. AR 4055–57, 4086–88, 4124–26. The first round of proposal revisions was due "no later than 1600 hours Central European Time on 21 March 2024." AR 4126. The Army later extended this deadline to March 25, 2024, at 0900 Central European Time. AR 5000. Any revisions received after the listed date and time were to "be handled in accordance with FAR 52.212-1(f)." AR 4126. Under FAR 52.212-1(f), "[a]ny offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered" unless it met certain exceptions. 48 C.F.R. § 52.212-1(f)(2).

b.  Proposal Revisions and Further Discussions

Centerra and CGS timely submitted their first revised proposals. AR 4624, 4999. Pond, however, submitted its first-round revisions on March 25, 2024, between 09:01:26 and 09:01:47 Central European Time— approximately one minute after the solicitation's deadline. AR 5865. The Contracting Officer determined that, because Pond's first-round revisions are "appropriately deemed late, they will not be considered." *Id.* The Contracting Officer still considered Pond's initial proposal, however, and did not exclude Pond from participating in potential future discussions:

> I see no reason to reject Pond's initial proposal or to otherwise exclude Pond from continuing in the competitive range. In this regard, I note that Pond's initial proposal was not deemed unacceptable. Pond will be provided an opportunity to submit a proposal revision in the event discussions are continued and/or final proposal revisions are requested from the

8

competitive range offerors.

*Id.*

After reviewing Centerra's first-round revisions, the Army found that Centerra "resolved all concerns for technical, past performance, and price," and the agency determined that it had "not identified any new matters to discuss." AR 5917, 7488. After reviewing CGS's first-round revisions, the Army found that, though CGS had resolved some concerns in its initial proposal, there were "additional concerns found in the revised proposal," including concerns with CGS's training schedule, on-the-job training plan, and price balance. AR 5928–35, 7488. Though the Army determined that Centerra "was awardable with no further concerns for all factors," it nevertheless concluded that "a second round of discussions would be in the best interest of the Government as it would increase the number of awardable offerors thus ensuring adequate competition." AR 7489.

On April 1, 2024, Centerra, CGS, and Pond were notified of a second round of discussions, where "[a]ll offerors were provided an opportunity to revise their proposals" by April 3, 2024. *Id.* Pond timely submitted its first revised proposal during this second round, while Continuity timely submitted its second revised proposal. AR 5969, 6181. Centerra did not submit a second revised proposal, informing the Army that its first revised proposal, submitted on March 25, 2024, would be its final proposal. AR 5966, 7489. The Army found that "CGS and Pond resolved all concerns for technical, past performance and price" and that there were "no new findings." AR 7490.

The Army closed discussions on April 11, 2024, but provided all offerors an opportunity to submit final revised proposals by April 15, 2024. AR 6705–13. Centerra once again notified the Army that its first revised proposal, with a proposed price of €920,204,440.69, was its final proposal. AR 6749, 7491. Pond submitted its final revised proposal on April 12, 2024, decreasing its proposed price from * * * * * * * * * to €978,604,158.19. AR 7491. CGS submitted its final revised proposal on April 15, 2024, decreasing its proposed price from * * * * * * * * * to €867,136,311.90. *Id.*

c.  Evaluation and Award

On April 18, 2024, the Army's Source Selection Evaluation Board ("SSEB") prepared a briefing for the Army's Source Selection Advisory Committee ("SSAC"), recommending the following adjectival ratings for each offeror:

| Offeror | Technical | Past | Performance | Price |
| --- | --- | --- | --- | --- |

|  | Rating | Rating |  |
|---|---|---|---|
| CGS | Good | Satisfactory Confidence | €867,136,311.90 |
| Centerra | Outstanding | Satisfactory Confidence | €920,204,440.69 |
| Pond | Outstanding | Substantial Confidence | €978,604,158.19 |

AR 6875, 7001.

On August 28, 2024, after reviewing the SSEB's findings, the SSAC prepared its comparative analysis and award recommendation report for the Source Selection Authority ("SSA"), the final award decisionmaker. AR 7494. The SSAC's ratings mirrored the SSEB's ratings except for its Technical Factor Rating for Centerra. *Id.* While the SSEB rated Centerra "Outstanding" for Technical Subfactor 1, Phase-In Plan, and "Outstanding" for its overall Technical Factor rating, the SSAC only rated Centerra "Good" for Technical Subfactor 1, Phase-In Plan, and "Good" for its overall Technical Factor rating. *Compare* AR 7001 *with* AR 7494. Below is the SSAC's overall ratings for each offeror:

| Offeror | Technical Rating | Past Performance Rating | Price |
|---|---|---|---|
| CGS | Good | Satisfactory Confidence | €867,136,311.90 |
| Centerra | Good | Satisfactory Confidence | €920,204,440.69 |
| Pond | Outstanding | Substantial Confidence | €978,604,158.19 |

AR 7494. After considering all evaluation factors, the SSAC ranked the offerors from best to least value: (1) Pond, (2) CGS, and (3) Centerra. AR 7496.

When comparing Pond's and CGS's proposals under the Technical Factor, the SSAC noted that, although CGS "has all [the] required licenses that can be obtained prior to award," CGS did not have "the company firearms license, which cannot be obtained until after a contract is awarded to an entity." AR 7500–01. As a result, the SSAC determined "there is potential risk to performance in the event the German licensing authority(ies) fails to timely issue the necessary licenses/permits" to CGS. AR 7501. On the other hand, the SSAC acknowledged that Pond's technical proposal was a "clear benefit to the government," because it already had all the required permits and licensing for performance. *Id.* Accordingly, Pond was given a "strength" under the permits and licensing requirement, because it is "set for full performance at the start of the period of performance and reduces the risk of not being able to obtain all required licenses within the phase-in period." AR 7500–01.

The SSAC also noted under the Technical Factor that Pond's already "established academy and training program includes certified instructors, per applicable regulation, enabling training to occur immediately." AR 7512. In comparison, CGS "will have to certify instructors for contract specific training." AR 7510, 7512. As a result, the SSAC gave Pond a "significant strength" under training a full workforce, concluding that Pond's proposal "substantially reduces risk of training the workforce during phase-in and is a clear benefit to the government, compared to CGS's." AR 7512. Additionally, the SSAC gave Pond a "significant strength" under maintaining a workforce, highlighting that Pond proposed a * * * larger guard force than CGS, providing "a clear benefit to the Government in maintaining schedules at posts throughout Germany." AR 7515, 7546.

When comparing Pond and CGS's proposals under the Past Performance Factor, the SSAC determined Pond's past performance to be "substantially superior" to CGS's. AR 7543. It noted that one of CGS's subcontractors, who would support * * * of the guard services, "has performed under an Army contract . . . but not in Germany," and its other contractor, who will support the other * * * of guard services, "is not listed as having performed under any DOD/Army contracts, however, it has performed in Germany." *Id.* By contrast, Pond "has directly performed multiple contracts for the Army in Germany." *Id.* The SSAC stated that it "places high value on past performance performed under Army contracts in Germany given the unique performance requirements related to such services," and thus, "Pond's past performance record is more relevant than CGS's." AR 7543, 7546. Overall, the SSAC concluded that Pond's "significantly better non-price proposal," including both under the Technical and Past Performance Factors, "warrants its substantially higher price as compared to CGS." AR 7546.

The SSAC also found Pond's proposal "substantially superior" to Centerra's. AR 7543. The SSAC noted that, when compared to Centerra, Pond proposed a * * * larger guard force, thereby providing a "substantial benefit to the Government in maintaining schedules at posts throughout Germany." AR 7545. Overall, the SSAC also concluded that "[Pond's] significantly better non-price proposal warrants its substantially higher price as compared to Centerra." *Id.*

Although CGS and Centerra received the same adjectival ratings for the Technical and Past Performance factors, the SSAC considered CGS's proposal "superior," because "CGS's advantages under Factor 1, notably its increased ability to maintain schedules with the higher guard force as

compared to Centerra, outweighs the benefits of Centerra's clear lines of communication, and language verification of key personnel." *Id.* Additionally, the SSAC determined that "even if the two offerors were approximately equal under the Technical factor, CGS would still represent the better value due to its lower price. Stated another way, the Centerra non-price proposal does not contain advantages over CGS that would warrant paying an additional €53,068,128.79 as compared to CGS." *Id.*

On August 29, 2024, in agreeing with and adopting the SSAC's findings and analysis, the SSA selected Pond for award, determining that "[Pond] represents the best overall value for the Government." AR 7592, 7595.

III.    Procedural History

On November 15, 2024, CGS and Centerra filed their respective complaints in this court, claiming that the contract was improperly awarded to Pond and requesting that the award decision be vacated and remanded to the agency to reevaluate the proposals for a new award decision. On November 20, 2024, because both cases involved common questions of law and fact, in accordance with Rule 42(a) of the Rules of the Court of Federal Claims ("RCFC"), we consolidated the two cases, with Case No. 24-1879 serving as the lead case.

Both CGS and Centerra filed their respective motions for judgment on the administrative record on January 10, 2025, claiming that the Army's award decision was arbitrary and capricious. Centerra and CGS both argue that, because Pond submitted its first revised proposal late, it should have been eliminated from consideration under FAR 52.212-1(f). Alternatively, even if the agency were allowed to consider Pond's initial proposal, plaintiffs allege the agency could not allow Pond to participate in further rounds of discussions and revisions.

CGS separately argues in its motion that (1) the agency improperly relied on unstated evaluation criteria in its past performance assessment by considering whether past contracts were performed in Germany and for a DOD entity; and (2) CGS received unequal treatment when the agency arbitrarily downgraded CGS's technical proposal, and favored Pond's proposal, regarding licensing and training requirements, although both proposals met the requirements of the solicitation.[4] In turn, Centerra

---

[4] In CGS's reply brief, it withdrew two arguments: (1) that the agency unreasonably downgraded two of CGS's past performance references for not

12

separately argues in its motion that (1) the SSAC arbitrarily downgraded Centerra's technical rating to "Good," where the SSEB initially assigned Centerra a technical rating of "Outstanding"; and (2) the agency arbitrarily focused on total staffing numbers in evaluating each offeror's technical proposal, where the solicitation only required minimum staffing numbers at each Army installation location.[5]

The government subsequently filed its cross motions on February 7, 2025. We address those motions here.

DISCUSSION

I.    Standard of Review

The Tucker Act grants this court jurisdiction over bid protests. 18 U.S.C. § 1491(b)(1). In any bid protest, this court reviews an agency's decision pursuant to the standards set forth in the Administrative Procedure Act ("APA"). § 1491(b)(4). Under the APA, we review an agency's action to see if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1)(A); *see also Off. Design Grp. v. United States*, 951 F.3d 1366, 1371 (Fed. Cir. 2020). The court may "set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

Generally, "[i]t is well established that contracting officers have a great deal of discretion in making contract award decisions, particularly when . . . the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1355 (Fed. Cir. 2004). This discretion, however, is not absolute. *Mortg. Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 129 (2021). "Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the

_____

having 24/7 armed mobile security at multiple access locations; and (2) that the agency did not credit CGS for its additional strengths in its technical proposal for medical screenings, background checks, language verifications, and retention strategy. CGS's Reply at 10 n.3, 13 n.5.

[5] In Centerra's reply brief, it withdrew its argument regarding the agency's alleged reliance on unstated evaluation criteria. Centerra's Reply at 3 n.1.

evaluation criteria and applicable statutes and regulations." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (internal citation omitted).

To obtain a permanent injunction, the protestor must show that "(1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest." *Gentex Corp. v. United States*, 58 Fed. Cl. 634 (2003). Here, CGS has successfully established each factor.

## II.    Success on the Merits

To succeed on the merits, plaintiffs "must show not only that significant errors occurred in the procurement process, but also that the errors were prejudicial." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000). We find that CGS's protest meets both prongs; the agency made a significant error when it relied on unstated evaluation criteria in downgrading CGS's past performance rating; and, given the substantial price difference between Pond and CGS's proposals, there is a substantial likelihood that, but for the agency's erroneous evaluation of CGS's past performance, CGS would be selected for award. On the other hand, we do not find Centerra prejudiced by a substantially erroneous evaluation of its proposal. All arguments are discussed below.

### a)    Pond's Late Proposal

Plaintiffs both argue that, under FAR 52.212-1(f), because Pond submitted its first revised proposal after the agency's submission deadline, the agency should have disqualified Pond from the competition. Alternatively, plaintiffs argue that, even if Pond's late submission did not disqualify it from the competition entirely, the agency could only consider Pond's initial, timely proposal, and could not allow Pond to participate in further rounds of discussions and revisions. Allegedly, by allowing Pond's participation, the agency "attempted to revive Pond's late proposal by conducting an additional round of discussions," thus "giving Pond an unlawful second bite at the apple." Centerra's MJAR at 16–17.

In response, the government asserts that it did not violate FAR 52.212-1(f), because the agency properly excluded Pond's untimely first revised proposal from consideration, and because there is no restriction against allowing Pond to participate in further discussions and revisions, given Pond's valid initial proposal. Further, the government claims that Pond did not improperly benefit from staying in the competition, since CGS and

Centerra were given equal opportunities to submit an additional interim proposal with Pond. We agree with the government.

Under FAR 52.212-1(f), "[o]fferors are responsible for submitting offers, and any modifications, revisions, or withdrawals, so as to reach the Government office designated in the solicitation by the time specified in the solicitation." 48 C.F.R. § 52.212-1(f)(1). "Any offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered unless" the offer, modification, revision, or withdrawal meets certain exceptions. § 52.212-1(f)(2)(i).[6] This is otherwise referred to as the "late-is-late" rule, where "a deadline for proposal submissions is strictly construed," and an "untimely submission becomes a stranger to the [procurement] process, and is disqualified from the procurement." *KGL Food Servs. WLL v. United States*, 153 Fed. Cl. 497, 506 (2021) (quoting *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009)). The late-is-late rule is meant to promote equal treatment and fair competition among offerors. *Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 575 (2013); *see also Integrated Bus. Sols., Inc. v. United States*, 58 Fed. Cl. 420, 428 (2003) ("[I]t would have been unfair to require the other offerors to submit [final proposal revisions] by the . . . deadline but permit [the plaintiff] to confirm its initial proposal days later.").

It is important to specify, however, that the late-is-late rule only automatically applies to an agency's consideration of late *submissions*. *Labatt Food Serv.*, 577 F.3d at 1381; *see also Syncon, LLC v. United States*, 154 Fed. Cl. 442, 453–54, 458 (2021) (applying the rule to a final offer containing an untimely price proposal submission). It is not per se unreasonable or unlawful for an agency to consider an offeror's initial, timely submission while simultaneously rejecting the offeror's later, untimely submission. *Geo-Seis Helicopters, Inc. v. United States*, 77 Fed. Cl. 633, 651 (2007) (permitting an agency to consider an offeror's initial proposal where the offeror's final revised proposal was untimely). An offeror's late, revised proposal does not automatically disqualify its timely, initial proposal from consideration where the other offerors fail to identify "any actual prejudice . . . suffered as a result of the late submission[]" or "any advantage afforded" to the delinquent offeror. *Savantage Fin. Servs., Inc. v. United States*, 158 Fed. Cl. 240, 249 (2022). Nor do plaintiffs cite any caselaw in which an untimely yet intermediary proposal revision precluded an offeror from

---

[6] Defendant does not claim that any regulatory exceptions to the late-is-late rule apply here.

participating in future rounds of proposal revisions.

Here, the solicitation incorporates FAR 52.212(f)—the late-is-late rule. Though Pond submitted its initial proposal timely, it did not submit its first revised proposal in time—submitting it approximately one minute past the due date. Accordingly, the agency determined Pond's first revised proposal was "appropriately deemed late" and "will not be considered." AR 5865. Thus, in accordance with FAR 52.212-1(f) and the solicitation, the agency appropriately rejected consideration of Pond's first revised proposal, because it was submitted to the agency past the prescribed due date.

We also find it reasonable that the agency allowed Pond to continue participating in further discussions and revisions, because there is no indication that Pond's participation resulted in unequal treatment or unfair competition among the offerors, which the late-is-late rule was intended to prevent. After evaluating CGS and Centerra's first revised proposals, the agency found that both offerors addressed all concerns with their initial proposals but found additional weaknesses with CGS's proposal regarding CGS's training schedule, on-the-job training plan, and price balance. The agency subsequently concluded that "a second round of discussions would be in the best interest of the Government as it would increase the number of awardable offerors thus ensuring adequate competition." AR 7489. Thus, "[a]ll offerors were provided an opportunity to revise their proposals"—Pond for the first time, and CGS and Centerra for the second time. *Id.* Allowing Pond, as well as CGS and Centerra, to participate in successive rounds of discussions and revisions ensured increased competition among offerors in the competitive range, as well as afforded equal opportunities to improve their proposals. Plaintiffs' claims that discussions were continued solely for the benefit of Pond ignores the fact that new negative findings were attributed to CGS's proposal after the first revision, and another round of revisions would also give CGS an opportunity to improve its proposal—which it did. Moreover, further rounds of discussions and revisions put Centerra and CGS at an advantage, as they were given three opportunities to revise their proposals, while Pond was only afforded two opportunities to revise its proposal. Thus, it was not unreasonable or unlawful for the agency to allow Pond to participate in future rounds of discussions and revisions.

Because Pond submitted its initial proposal on time, and because the agency did not consider Pond's untimely first revised proposal, we do not find the agency's consideration of Pond's initial proposal to be unlawful under FAR 52.212-1(f). Additionally, because the agency's inclusion of Pond in successive rounds of revisions did not amount to unequal treatment

or unfair competition, we do not find it undermined the purpose of FAR 52.212-1(f).

b) Reliance on Unstated Evaluation Criteria

Next, CGS claims the agency relied on evaluation criteria not found in the solicitation in making its award decision. CGS claims its Past Performance rating was demoted to "Satisfactory Confidence" because its past performance references lacked experience in Germany and for a Department of Defense ("DOD") entity, which CGS alleges are unstated evaluation criteria. We agree with CGS.

Generally, it is well understood that "agencies are required to evaluate proposals and make contract awards based on the criteria set forth in the solicitation." *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 560 (2017). Necessarily, "[a]n agency decision is arbitrary and capricious if the decision is a product of the agency's application of unstated evaluation criteria." *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 (2024). To succeed on an unstated evaluation criteria claim, a protestor must show that "the procuring agency used a significantly different basis in evaluating the proposals than was disclosed." *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009) (quoting *Banknote Corp.*, 56 Fed. Cl. at 397)). We also note, however, that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Analytical & Rsch. Tech., Inc. v. United States*, 39 Fed. Cl. 24, 45 (1997).

Here, the solicitation announced that the agency would evaluate past performance based on recency and relevancy. Relevancy was to be determined by an evaluation of scope, magnitude, and complexity. The solicitation expressly defined "relevant scope" as "contracts involving armed security guard services," "relevant magnitude" as "contracts with an estimated annual value equal to or greater than €10 Million" and "relevant complexity" as "contracts for 24 hours/7 days services guarding multiple access locations." AR 2173–74. Additionally, the solicitation described the rating, "Very Relevant," as "past performance . . . involv[ing] essentially the same scope and magnitude of effort and complexities this solicitation requires" and "Relevant" as "past performance involv[ing] similar scope and magnitude of effort and complexities this solicitation requires." AR 2174.

17

The solicitation does not indicate that contracts would be evaluated based on whether they were performed in Germany or for a DOD entity.

In evaluating CGS's past performance, however, the Past Performance Evaluation Team ("PPET"), a subset of the SSEB, determined that, although all seven past performance references were "relevant," they could not be rated "Very Relevant," because none of them had services performed both "for the Department of Defense and [in] Germany as the place of performance *in addition to the solicitation requirements of recency and relevancy*." AR 7136 (emphasis added). Subsequently, when comparing CGS's past performance with Pond, the SSAC determined that Pond's past performance was "substantially superior" to CGS's, because one of CGS's subcontractors "performed under an Army contract . . . but not in Germany," and the other subcontractor "is not listed as having performed under any DOD/Army contracts, however, it has performed in Germany." AR 7543. Again, the agency noted in its post-award debrief that "[n]one of [CGS's] references have services performed for the Department of Defense and Germany as the place of performance which might warrant a Very Relevant rating" and concluded that "a higher confidence rating is not warranted." AR 7974. Altogether, it is clear from the record that the agency relied on Germany and DOD specific experience—criteria not found in the solicitation—in decreasing the relevance ratings for CGS's past performance references, and thus, downgrading CGS's overall past performance rating.

In response, the government claims the solicitation intrinsically included German-specific criteria in its scope, because "[t]he [s]olicitation contained numerous requirements unique to performing services in Germany, such as compliance with German labor law, local national screening program requirements, Germany-specific training certification requirements, German firearm licensing requirements, drug testing requirements, and host nation weapons training requirements, among others." Def.'s Cross-MJAR at 23. This argument is unconvincing. First, the German-specific requirements the government cites are within the solicitation's Technical Factor—not the Past Performance Factor. AR 2164–65. An agency's evaluation of past performance is generally distinct from other factors. *XPO Logistics Worldwide Gov't Servs., LLC v. United States*, 134 Fed. Cl. 783, 804 (2017), *aff'd*, 713 F. App'x 1008 (Fed. Cir. 2018). Thus, to claim German-specific criteria were inherent in the past performance evaluation, the solicitation must have included German-specific

requirements in the Past Performance Factor. Nor does the solicitation explain that the past performance experience had to take place in Germany to meet the German-specific requirements under the Technical Factor. The record shows that CGS "adequately addressed" numerous German-specific requirements under the technical factor, although not all of its past contracts were performed in Germany. AR 7500, 7502–03, 7505–06, 7508, 7511, 7514, 7532. As a result, to the extent the agency relied on Germany and DOD specific experience in its past performance evaluation, we find it relied on unstated evaluation criteria.

c) Unequal Treatment Between CGS and Pond

Next, CGS claims that it received unequal treatment under the Technical Factor as compared to Pond, because the agency arbitrarily downgraded CGS's technical proposal and favored Pond's technical proposal, although both proposals met the requirements of the solicitation. According to CGS, the agency's evaluation of the solicitation's licensing and training requirements was meant to "penalize any offeror who is not the incumbent." CGS's MJAR at 35. We address those arguments below.

First, CGS claims the agency unreasonably penalized it, and favored Pond, when evaluating their proposals under the permits and licensing requirements. The solicitation required that offerors submit a Phase-In Plan, including a process for obtaining all applicable permits and licenses, and informed offerors that the agency's evaluation of the Phase-In Plan would focus on whether it would "result in successful execution of full contract performance at all locations within or before the end of the six-month phase-in period." AR 2174. CGS and its main subcontractor obtained all of the required licenses and permits—save for a Company Firearm License, which, under German law, offerors could not receive without an already awarded contract—and its smaller subcontractor already held or was expected to obtain all the required licenses and permits within 30 days of award. Regardless, the SSAC treated the fact that CGS did not have a Company Firearms License as a risk, and gave Pond's proposal a strength, because, as the incumbent under the current contract, "it has all the permits/licenses required for this contract." AR 7500. CGS thus claims that, instead of evaluating whether offerors could obtain the necessary licenses and permits for full contract performance within the six-month phase-in period as required by the solicitation, offerors were penalized for not possessing all

licenses and permits by day one of performance. As a result, CGS asserts that its technical proposal received unequal treatment, as it was arbitrarily downgraded for not already having a license it could only receive as the incumbent.

Second, CGS claims the agency unreasonably penalized it, and favored Pond, because, as compared to Pond, CGS would have to certify its instructors for contract-specific training. As CGS notes, the solicitation notified offerors that "[t]he Government shall provide initial and refresher training (as required) to the Contractor's instructors, who shall then conduct initial training for all personnel and refresher training for employees performing access control functions." AR 2133. When comparing CGS's and Pond's proposals, however, the SSAC found that, unlike CGS's proposal, Pond's "established academy and training program includes certified instructors, per applicable regulation, enabling training to occur immediately" and that, because Pond's teams were already certified and approved, this "reduces the risk of training . . . teams during phase in." AR 7512. CGS asserts that, contrary to the terms of the solicitation, which informed offerors that contract specific training would initially be provided by government personnel, the agency arbitrarily downgraded CGS's proposal for not already having certified instructors, which it alleges is another example of unequal treatment.

After reviewing the record, we find CGS's arguments unconvincing. Generally, "[i]t is well-established that a 'contracting agency must treat all offerors equally, evaluating proposals even handedly against common requirements and evaluation criteria.'" *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 490 (2013) (quoting *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 483 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)). Uneven treatment "goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004). We also recognize, however, that "[w]hile an agency may not unduly tip the scales in favor of an incumbent contractor, an agency is not required to ignore the benefits or advantages derived from the offeror's incumbency, and it likewise need not attempt to level the playing field for all other offerors." *Samsara*, 169 Fed. Cl. at 322; *see also ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 203 (2007) ("[d]ecisions of this court, as well as other GAO opinions, are to similar effect, emphasizing that the government need not

forego the benefits of incumbency in ensuring a level playing field."). Indeed, the FAR does not prohibit an agency from recognizing an "inherent incumbent advantage." *VSolvit, LLC v. United States*, 151 Fed. Cl. 678, 690 (2020) (internal citations omitted).

CGS's arguments regarding the agency's evaluation of licensing and training under the Technical Factor are merely directed at Pond's inherent advantages as an incumbent rather than any unequal treatment. Because Pond is the incumbent under the current armed security services contract, it already has all the required licenses and permits—including the Company Firearm License—required by the solicitation. Additionally, because of Pond's position as an incumbent, its trainers are already "certified by the appropriate agency to train and certify [its] dedicated local [t]rainers on all required courses for this contract." AR 6417. The agency is by no means required to ignore Pond's advantages as an incumbent, especially when those advantages preemptively fulfill the solicitation's requirements.

Furthermore, the agency reasonably assigned Pond a strength for its licensing advantage, concluding that its pre-obtained licenses and permits sets Pond "for full performance at the start of the period of performance and reduces the risk of not being able to obtain all required licenses within the phase-in period." AR 7501. We have found that where a foreign government requires a contractor to obtain certain licenses, and the incumbent contractor, by operation in that country, has already acquired those licenses, it is not unreasonable for the agency to consider the incumbent's licensee status in its award decision, as "this Court is not vested with the statutory authority or inherent power to require [a foreign] government to issue a [license]." *Associated Energy Grp., LLC v. United States*, 172 Fed. Cl. 799, 813–14 (2024). Similarly, the agency also reasonably assigned Pond a significant strength for its certified instructors, stating that it "enable[s] training to occur immediately" and "substantially reduces risk of training the workforce during phase-in." AR 7512. As these are "clear benefit[s] to the government," Pond was reasonably assigned strengths for its two advantages. *Id.* We concurrently find no evidence in the record that CGS's technical ratings were penalized by not already meeting the solicitation's licensing/permit and training requirements. As the SSAC noted, "no weaknesses or deficiencies were identified in any of the three final proposals in the competitive range with respect to Factor 1, Technical." AR 7494.

Overall, we find that it was within the agency's discretion to grant Pond strengths for its licensing/permit and training qualifications stemming from its inherent advantages as an incumbent.

d)  Centerra's Downgraded Technical Rating

For Centerra's part, it alleges that, whereas the SSEB initially gave it a Technical Factor rating of "Outstanding," the SSAC arbitrarily downgraded Centerra's technical rating to "Good." More specifically, the SSEB assigned Centerra an "Outstanding" rating for Technical Subfactor One, Phase-In Plan, and a "Good" rating for Technical Subfactor Two, Management Plan—thus, resulting in an overall technical rating of "Outstanding." The SSAC, however, assigned Centerra "Good" ratings for both technical subfactors, amounting to an overall Technical Factor rating of "Good." Centerra claims that, although the SSAC "disagrees with the adjectival ratings assigned by the SSEB," the SSAC failed to offer any substantive rationale for their disagreement. AR 7494. In Centerra's view, there is no indication its proposal met the solicitation's description of a "Good" rating, especially since the SSAC recognized an additional strength in Centerra's proposal regarding Centerra's organizational structure. We do not find the SSAC's technical rating unreasonable.

"[I]t is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.'" *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973). We recognize, however, that "the court may not substitute its judgment for the agency's expertise in procuring services to meet the needs of the government." *Advanced Am. Constr., Inc. v. United States*, 111 Fed. Cl. 205, 216 (2013). As long as there is a reasonable basis for the agency's decision, "the court should stay its hand even though it might, as an original proposition, have reached a different conclusion." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). Further, as a general matter, a protestor's challenges to the "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).

Here, the SSAC sufficiently explained its rating of "Good" for Centerra's technical proposal. The SSAC noted that it "discussed its views

with the SSEB," and that "[a]lthough the SSEB continues to maintain their rating of Centerra's proposal as appropriate . . . the SSAC concludes otherwise and notes that the SSAC ratings of Centerra and CGS are consistent with its comparative assessment of the proposals *as outlined below*." AR 7495 (emphasis added). The SSAC proceeds to a 44-page analysis of its Technical Factor evaluation, which highlights that, although Pond and Centerra are given the same number of "strengths" in the Technical Factor—including the additional strength found for Centerra's organizational structure—Pond has three "significant strengths" where Centerra has none. AR 7496–7540. Specifically, Pond's significant strengths were in its recruiting and hiring, training a full workforce, and maintaining a workforce. AR 7497, 7510, 7515. Thus, the SSAC reasonably awarded Pond an "Outstanding" technical rating while Centerra was only given a "Good" technical rating. Although Centerra was initially given an "Outstanding" technical rating by the SSEB, this does not preclude the SSAC from applying its own independent analysis and judgment. Moreover, the mere fact that an additional strength was found in Centerra's technical proposal does not in itself make the SSAC's evaluation arbitrary, as adjectival ratings are "not subject to a mathematical calculation" where "ratings can be added up and 'averaged out' to score the contractor." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 909 n.6 (Fed. Cir. 2013). As we cannot find the SSAC's technical evaluation of Centerra's proposal unreasonable, we decline to substitute the agency's judgment for our own.

e) Agency's Focus on Total Proposed Staffing Numbers

Centerra also claims the agency irrationally evaluated its proposal under Technical Factor, Subfactor Two, Management Plan, by focusing on total proposed staffing numbers as opposed to staffing numbers at each garrison location. The solicitation requires the contractor to have a set number of people performing certain security services at each garrison location. AR 2156–57. It does not contemplate a minimum number of total staff, encompassing all garrison locations. Centerra claims the agency improperly focused exclusively on the aggregate number of personnel in evaluating each offeror's staffing plan. The SSAC assigned Pond a "significant strength" because it had a "[* * *] or additional [* * *] personnel, larger guard force" than Centerra, and a "[* * *] or additional [* * *] personnel, larger guard force" than CGS. AR 7519. As a result, Centerra

asserts that the agency's evaluation of its proposal under the Technical Factor was inconsistent with the solicitation.

We do not find Centerra's argument compelling. It ignores other requirements of the management plan subfactor that comport with the agency's evaluation. The management plan subfactor requires offerors to provide a plan that includes "how the offeror will maintain the required schedules; manage the day-to-day leave; maintain staffing, to include staffing of[] EDD teams, during times of vacations/holidays and during seasonal illness such as the flu season; and ensuring employee retention to limit employee turnover." AR 2165. Accordingly, when comparing Centerra and Pond's proposals, the agency concluded that Pond's "[* * *] higher guard force is a substantial difference as compared to Centerra and may prove to have immense impact on the ability to cover posts at all installations." AR 7539. Likewise, when comparing CGS and Pond's proposals, the agency noted that Pond's "[* * *] higher guard force is a clear difference and increases its ability to maintain schedules throughout Germany." AR 7540. In focusing on Pond's higher overall staffing numbers, the agency reasonably concluded that Pond was better equipped to maintain staffing and schedules, as required by the management plan subfactor. Moreover, the record shows that, not only did the agency focus on overall staffing numbers, but the agency also considered staffing numbers at each garrison location. AR 7518. For example, when comparing Centerra's staffing numbers with CGS, the SSAC recognized that "[w]hile CGS proposed a higher guard force, the number of [g]uards proposed for the [* * * * * * * *] location is very low compared to Centerra [* * * * * * * *] and is a possible risk area in maintaining schedules for that one Access Control Point (ACP)." *Id.* Consequently, we do not find the agency's focus on total proposed staffing numbers arbitrary, nor do we find its overall evaluation of the management plan subfactor contrary to the solicitation.[7]

---

[7] Centerra also briefly argues that Pond's proposal should not have been assigned a strength for its proposed staffing number of * * * *, because Pond could not fully staff its workforce before the end of the phase-in period. Centerra quotes Pond's proposal, stating that, "by contract start [Pond] will be bridging the gap between minimal baseline staffing at 5.5 and identified optimal levels above this to cope with the high vacation timeframes, holidays, and flu seasons." AR 6402. We find this argument meritless, as it mischaracterizes Pond's proposal. The record shows that "bridging the gap"

f) Prejudice

As we find that only CGS has identified an erroneous evaluation of its proposal, we now address whether it was prejudiced by the agency's error. Where a protester shows a significant error in the procurement process, it must also show it was actually prejudiced by that error to obtain relief. *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024) (quoting *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018)). In other words, CGS must show that, but for the agency's error, "there was a reasonable likelihood that [it] . . . would have been awarded the contract." *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

Here, but for the agency's error in relying on unstated evaluation criteria—namely, past performance experience in Germany and for a DOD entity—in assigning its past performance ratings, CGS stood a substantial chance of being selected for award. The agency found that, out of CGS's seven references, five of them were "relevant," while two were "somewhat relevant," amounting to an overall "Satisfactory Confidence" past performance rating. AR 7973. The agency reasoned that none of CGS's references warranted a "Very Relevant" rating because they were not "performed for the Department of Defense and Germany as the place of performance," which we deem are unstated evaluation criteria. AR 7136. Thus, without taking into account CGS's lack of past performance experience in Germany or for a DOD entity, there is a reasonable likelihood that the relevancy ratings for CGS's references would improve, potentially resulting in a higher overall past performance rating.

Additionally, we recognize that, though Pond still retains an "Outstanding" rating versus CGS's "Good" rating under the Technical Factor, the solicitation places "Price" as the single most important factor in the agency's evaluation. AR 2170. Given that Pond's price proposal is over €111,000,000 more expensive than CGS's—approximately an 11% price differential—there is a substantial chance that, if CGS's past performance

---

to reach "optimal levels" refers to Pond attaining personnel numbers *above* its baseline proposal of * * * * to better account for illness, vacation, training, and unproductive times. AR 6402, 6420–21. Thus, the agency reasonably assigned Pond a strength for its proposed staffing number.

rating were to improve, CGS would be awarded the contract. As a result, we find prejudicial error, and accordingly, success on the merits.

IV.    Irreparable Harm

We may grant injunctive relief where a protestor shows "it would be irreparably injured in the form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom." *Metcalf Const. Co. v. United States*, 53 Fed. Cl. 617, 645 (2002). Here, if an injunction were not granted, CGS would lose an opportunity to fairly compete for the armed security services contract, as the agency applied unstated evaluation criteria in downgrading CGS's proposal under the Past Performance Factor. As a result, CGS reasonably claims it has potentially lost millions in profits. Thus, CGS has sufficiently shown irreparable harm.

V.    Balance of the Hardships

We find that the balance of the hardships favors injunctive relief. This injunction does not require the agency to conduct a completely new procurement. It only requires the agency to reevaluate CGS's and Pond's proposals under the Past Performance Factor in accordance with law. In the face of a clear procurement violation, which impacts CGS's ability to fairly compete for the contract, the requirement that the agency reevaluate past performance constitutes no real detriment to the government.

VI.    Public Interest

We have long held that "where 'a [p]laintiff has established that defendant's contract award violated procurement regulations and involved arbitrary and capricious behavior[,] [t]he public interest in preserving the integrity of the procurement system . . . weighs in favor of granting injunctive relief.'" *IAP Worldwide Servs., Inc. v. United States*, 159 Fed. Cl. 265, 323 (2022) (quoting *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 117 (2013)). The agency's violations here involved arbitrary and capricious behavior by relying on unstated evaluation criteria in making its award. Granting CGS's prayer for relief preserves the integrity of the procurement process, promotes healthy competition, and bolsters public confidence in the federal procurement system. Here, injunctive relief is in the public's interest.

CONCLUSION

26

Because the agency erroneously evaluated CGS's proposal under the Past Performance Factor by relying on unstated evaluation criteria, and because CGS was prejudiced as a result, we grant CGS's motion for judgment on the administrative record. Because we have not found the agency made an otherwise erroneous evaluation, we deny Centerra's motion for judgment on the administrative record. We deny the government's cross-motion with respect to CGS and grant it with respect to Centerra. Accordingly, the following is ordered:

1. The agency's current award decision is vacated, and the agency is enjoined from further pursuing the contract with Pond.

2. The agency is directed to reevaluate CGS's and Pond's proposals under the Past Performance Factor in accordance with this opinion and make a new award decision.

3. The Clerk of Court is directed to enter judgment accordingly.

4. No costs.

<u>s/Eric G. Bruggink</u>
Eric G. Bruggink
Senior Judge

27